the Lenox Corporation would not afford reasonable security to those who might deal with it or of its "insolvency," within the intent and meaning of that word as used in the title of the Code of Civil Procedure relating to this subject. Sterrett v. Bank, 46 Hun, 22; Brouwer v. Harbeck, 9 N. Y. 589; Baker v. Emerson, 4 App. Div. 348, 38 N. Y. Supp. 576; French v. Andrews, 81 Hun, 272, 30 N. Y. Supp. 796; Denike v. Cement Co., 80 N. Y. 599; National Broadway Bank v. Wessell Metal Co., 59 Hun, 470, 13 N. Y. Supp. 744. The court, having acquired jurisdiction, could make the order nunc pro tunc, correcting the formal defects in its order reciting that insolvency had been satisfactorily shown. In re Christian Jensen Co., 128 N. Y. 550, 28 N. E. 665.

Upon the filing of the receiver's bond, his right related back to the time the order was granted and entered, from which time the property is deemed custodia legis, and appellant acquired no lien thereon by virtue of its execution delivered to the sheriff after he had been enjoined from enforcing the claims of creditors. In re Christian Jensen Co., supra.

Appellant also contends that it has been misled to its prejudice by the misrepresentations of an officer of its judgment debtor, in consequence of which it deferred entering judgment for three days. A controverted question of fact is presented by the denial that any misrepresentation was made or that the company was guilty of bad faith. We refrain from reviewing the decision of the special term on this question of fact, if the special term did decide it, which is doubtful, for two reasons: (1) Appellant should have moved promptly and within the life of its execution; and (2) it appears that other creditors whose claims exceeded the personal property of the judgment debtor were prepared to enter judgment before appellant was entitled so to do, and they were induced to refrain from so doing upon the understanding that they would not thereby lose their priority, and it would therefore be inequitable to allow appellant a preference over them. The order appealed from should be affirmed, with costs.

Order affirmed, with $10 costs and disbursements. All concur.

---

SHEPARD v. BOULEVARD LAND CO. OF OSWEGO et al.

(Supreme Court, Appellate Division, Fourth Department. December 11, 1900.)

MORTGAGES—DEED OF MORTGAGED PREMISES—CANCELLATION OF DEBT.

 A suit brought by S. to foreclose a mortgage made to secure a corporation's bonds was dismissed on the transfer to him of all the corporation's property, most of its stock, and valuable claims against the corporation, together with all remaining bonds canceled. There was no consideration for such transfer except the cancellation of the bonds held by S. His title was all he could have acquired by foreclosure sale, which would have canceled his bonds. He had strong reasons for desiring to get title at once. He wrote a friend that he had paid a high price for the lands, and testified that it was left to him to see that the mortgage was satisfied by a certain time. S. afterwards contracted to sell the property, but made no provision in the contract that the conveyance

should be subject to the mortgage. After attachment and sale of property under subsequent liens, S. brought suit to foreclose the mortgage. *Held*, that S.'s bonds were paid by the above transfer, and the mortgage thereby satisfied; hence his suit should be dismissed.

Appeal from judgment on report of referee.

Action by C. Sidney Shepard against the Boulevard Land Company of Oswego and others. From judgment in favor of defendants, plaintiff appeals.

The Boulevard Land Company defaulted in the payment of the interest due on certain bonds (which interest was payable semiannually on the 1st days of January and July) January 1, 1895, and July 1, 1895, and, such interest remaining unpaid, and defaults in procuring insurance also being claimed, and having taken, as claimed, the necessary steps required by the terms of the mortgage to entitle him to maintain such action in his own name on the refusal of the trustees so to do, the plaintiff, on or about August 8, 1895, brought action for the foreclosure of said mortgage, and to recover the entire principal and unpaid interest on his said 30 bonds. Answers were interposed by various defendants to that action; among others, by said Clark, setting up her ownership of the said 4 bonds, and demanding the payment thereof ($2,000) from the proceeds of the sale in said foreclosure. The issues made in this action were undetermined, and said action was pending, when, on the 24th day of April, 1896, as a result of several days of negotiations between parties and their representatives, the Boulevard Land Company, the mortgagor, by warranty deed conveyed title in fee to said plaintiff of all the lands covered by said mortgage, excepting certain lots which had theretofore been sold and released therefrom, and also turned over to him maps, surveys, searches, and all other papers connected with the land or its title; and at the same time Mr. Burt transferred and assigned to said plaintiff absolutely more than two-thirds of the capital stock of the Boulevard Land Company, and all of his other claims and demands, amounting to several thousand dollars, which said company owed him. Besides, the $2,000 of said bonds then owned by the said Clark were, by the defendants in that action, or some of them, bought up at an expense of about $500, and turned over to the plaintiff to be canceled, as were also the other $3,000 bonds which had previously thereto been canceled. The Boulevard Land Company had no other property or assets. So, as appears, the plaintiff, by that transaction, became the absolute owner of all the property and assets of the mortgagor, the Boulevard Land Company; had absolute title to all its real estate; and held all the bonds, canceled or uncanceled, and was the assignee and owner of over two-thirds of its capital stock, and of all the other outstanding claims and demands, as far as appears, against said company, excepting the balance of the stock; and nothing was paid to or received by the Boulevard Land Company or Mr. Burt therefor. Concurrent with the aforesaid transactions, and as a part of the agreement theretofore made, the plaintiff entered into a written contract, by a separate and independent instrument, with the Lake Ontario & Riverside Railway Company, whereby he agreed to sell and the said company agreed to purchase the real estate so transferred to plaintiff as aforesaid for the sum of $16,025, with a provision that, if the railway company failed to fulfill, the plaintiff could declare the contract null and void, and retain any amount that it may have paid, and any and all improvements and structures which it may have placed on said property. This contract also provided that the railway company should deposit with the plaintiff 26 of its then lately issued bonds, of the par value of $13,000, as collateral security to its promissory note of $7,500, to be given the plaintiff for a loan of money of that amount to be made by him to the railway company, with which the company was to erect a hotel on the premises specified in the contract. The foreclosure action was then, by the terms of the written stipulation, discontinued, and plaintiff at once went into possession of the real estate under his deed. Plaintiff immediately furnished the railway company the $7,500, in consideration of which the company executed and gave to him its promissory

note for the amount, and also the said $13,000 of bonds as collateral, as agreed. Possession of the property was soon given by plaintiff to the railway company, which subsequently erected the hotel on the premises at a cost of about $10,500, including the extras. The railway company subsequently went into the hands of a receiver, and failed to fulfill the balance of its contract with the plaintiff, and on or about February 18, 1897, plaintiff declared the contract void, and retook possession of the premises, including the said hotel, as he had a right to under his contract, and caused the said hotel to be insured in his own name for between $7,000 and $10,000, still retaining the said note of the company and the said collateral bonds (which had been increased by subsequent arrangements to more than the original $13,000), which he was entitled to do under the contract, as valid obligations against the company. It further appears that during the months of July and August, 1896, several mechanics' liens for labor and materials furnished in the construction of the hotel were filed against the property, and in or about the months of April and July, 1897, two actions were brought for the foreclosure thereof. The plaintiff herein was made a defendant as owner of the realty and in possession, and answered in said actions. Subsequently said actions were consolidated, and tried as one action, at a special term of the supreme court held at Oswego on or about March 21, 1898. On the trial the plaintiff herein appeared by his attorney, and defended the action. Judgment was rendered in the action in favor of the lienors, and the premises were duly sold thereunder at public sale to satisfy the liens on the 9th day of June, 1898. The plaintiff had due notice of and was present at such sale by his attorney. The premises were struck off to Robert G. Post for the sum of $3,419.36, and a deed of the same executed and delivered to him by the sheriff making the sale, under which he took possession of the real estate, up to which time plaintiff had remained in continuous possession under his deed since he retook the same from the railway company as aforesaid. It appears that the present action was not commenced, nor does it appear that any claim was made under the mortgage by the plaintiff from the time of the discontinuance of the former action, April 24, 1896, until on or about the same day of the commencement of the trial of the action to foreclose the mechanics' liens, March 7, 1898, when this present action was begun, and without any new application to the trustee, or any refusal to bring the same, the plaintiff claiming to derive authority from the proceedings in that regard taken before he commenced the said former action in August, 1895, to foreclose the same mortgage.

The following is the opinion of the referee:

"The first important question in this case is the construction and purpose of the transaction of April 24, 1896, when the defendant Boulevard Land Company transferred to plaintiff absolute title of the premises described in the complaint. A considerable amount of evidence was given on the trial, much of it very remote, and some of it seemingly quite immaterial, for the purpose of throwing light upon those transactions, and getting at the real intention and understanding of the parties, to determine what effect should be given thereto. After a full and careful consideration of all the evidence, I am of the opinion that the $15,000 of bonds were paid and satisfied by the transaction aforesaid, and that it was intended by both parties to the deed that such transfer should operate as a full payment and discharge thereof, and, as a consequence, the mortgage sought to be foreclosed in this action, given as a security for such payment, became functus officio, and was no longer a subsisting lien upon the premises; all the other bonds secured thereby having also been paid and canceled. It appears that plaintiff expected to obtain and was desirous of obtaining title to the premises on the judicial sale in the foreclosure proceedings pending at the time of the transfer to him, which was agreeable to the Boulevard Land Company, but that some considerations existed which made it more desirable to all parties that plaintiff should take the title at once direct from the land company, and stop the foreclosure proceedings. One reason was that the plaintiff expected to convey the land, after receiving title, to the Lake Ontario & Riverside Railway Company, and was contemplating making, if not about to enter into, a written contract with the railway company to make such conveyances before he had,

in fact, the title. That there was danger to the plaintiff in making such a contract under the circumstances was fully appreciated by those acting for him, because at a judicial public sale some one might step in and bid off the property for a greater sum than the amount of plaintiff's bonds, especially as it was expected that by the time such sale could be brought about the railway company would have increased the value of the property by the erection of a hotel thereon at a cost of $7,500, and plaintiff might thus lose the property, and still be liable on his contract with the railway company. It was too risky, and plaintiff was desirous of avoiding the trouble that might arise by pursuing that course. Another reason was that, as all parties agreed, the hotel which the railway company was to erect after it had contracted for the purchase ought to be commenced at once, and completed in time for the summer trade, which could not be done if plaintiff waited to get his title at the foreclosure sale, even if he was fortunate enough to then obtain it. The foregoing seem to have been all the reasons existing for a change in the method of plaintiff getting title to the premises. Now, if plaintiff had followed out his original intention, and obtained his title by a sale under his foreclosure proceedings, of course the result would have been the cancellation of his bonds, and the satisfaction or extinguishment of the mortgage foreclosed. I cannot find from the negotiations which resulted in the agreement to change such plan that plaintiff claimed or expected to be put in any better or different position as to his title than if he should have acquired it on the foreclosure sale, or especially that his bonds should be deemed unpaid, and said mortgage continue in force, after he had acquired title under the new arrangement. His anxiety, as well as that of his attorney, both before and after the change had been agreed upon, seems to have been to have the title as perfect and as well protected as if he had acquired it at a sale on foreclosure, which was very natural. And there seems to be no question but that the title which he did receive was perfect, and all that could have been acquired at the contemplated foreclosure sale, and with a full protection to which we shall later allude.

"As to whether the mortgage should be satisfied or not was a subject of conversation in the making and completing of the arrangements for the deed, but there is a conflict of evidence as to such conversation; the defendants claiming that it was the agreement that the bonds should be canceled, and the mortgage satisfied, while the plaintiff's evidence tends to show that it was left optional for the plaintiff to satisfy it or not; or, as plaintiff testified on his cross-examination: 'I was to see that it was satisfied at the time that the contract for the sale fell due. When I was under contract to deliver a deed to the railway company, then I was to see that this was satisfied.' Considering only the evidence given on the part of the plaintiff on the trial, and all the undisputed facts and circumstances, if we lay aside the direct evidence offered by the defendants, I should still be compelled to hold that it was understood by the parties that the transfer of the title to plaintiff, and the other transactions of the same date, were to operate as a satisfaction in fact of the mortgage, and that the conversations alluded to in the evidence related only to the mortgage being satisfied or discharged of record; and when we also consider, in addition, the affirmative evidence of the defendants on the subject, there does not seem to be much room for doubt. It seems to me quite improbable that the attorney, who was the president of the Boulevard Land Company, and acted for it in these transactions, would have agreed to that company's giving to plaintiff a warranty deed if he had understood that the mortgage in question was to remain a lien on the premises; and quite as improbable that he, being also president of the Lake Ontario & Riverside Railway Company, and acting for it in making the land contract with plaintiff, should have consented to the latter company's entering into such contract to purchase the premises in question, and to pay the sum of $16,025 therefor, and, in addition, to expend the sum of $7,500 in the erection of a hotel on the premises, which the railway company was bound to do, and to accept a deed of the land (wherein plaintiff was to covenant only against his own acts), subject to the mortgage in suit. If such was the case, we should have expected, it seems to me, that the contract would have contained a provision

therefor, as it did provide that the railway company 'should pay all taxes and assessments from date hereof upon said premises, and should pay all taxes now unpaid on said property, if any, and accept said deed and title subject to any and all tax liens.' The contract in question was drawn by the attorney for plaintiff, and if it was, or was to be, sold to the railway company, subject to the mortgage, should we not expect to find inserted in the contract a provision to the effect that the deed should be accepted subject to such mortgage? It certainly was a matter of greater consequence than the tax liens. If the bonds were paid, and the mortgage thereby actually satisfied, its satisfaction or discharge of record was a matter of small concern, and, as to time, may well have been left to the pleasure or convenience of the plaintiff. As to the bonds, while the defendants claim it was affirmatively agreed that the transfer should be in payment thereof, the plaintiff's contention is to the effect that nothing was said upon that subject. I do not recall that there is any affirmative claim made by the evidence of the plaintiff that his bonds were not to be paid by the transaction of April 24, 1896, but it is claimed that nothing was said about it then or in the prior negotiations. Unless the transferring of the property to the plaintiff was to operate as a payment of his bonds, and the consequent discharge of the mortgage, it is difficult to find any consideration for the Boulevard Land Company turning over its entire property to plaintiff, or any reason why it should have so done, or why Mr. Burt should have turned over to plaintiff all his claims, amounting to several thousand dollars, against the company, and over two-thirds of its capital stock (which is undisputed), for the protection of the title transferred to him by the Boulevard Land Company. We do not lose sight of the other concurrent transactions, which, although between other parties, were a part of the general agreement. But each of those transactions, while concurrent, were founded upon considerations independent of the one we have considered. The plaintiff contracted to sell, and the Lake Ontario & Riverside Railway Company to purchase, the premises to which plaintiff took the title aforesaid for the agreed consideration of $16,025 in gold; that being, as I assume, about the face value of his bonds and interest, or, in other words, what the premises had cost him, he still to retain the stock and claims which have been assigned to him by Burt. He was not to pass the title until the money was paid. He also loaned to the railway company $7,500, which was to be expended in betterments upon the premises by the erection of a hotel therewith. In consideration thereof, and as security therefor, the railway company gave to plaintiff its promissory note for $7,500, and $13,000 of its bonds as collateral. There is nothing in the evidence to show but that all parties considered the plaintiff to be adequately secured for the loan at the time it was made.

"The subsequent events,—the erection by the railway company of the hotel, its failure to fulfill the balance of its contract, the fact that plaintiff declared the contract forfeited, and took back possession of the premises, and held it under his title, its value having been enhanced by the expenditure of about $10,000 by the building of the hotel, and the plaintiff lawfully retaining the note of the company and the $13,000 and upwards of its bonds as collateral, while being matters established in the case, throw but little, if any, light upon the intention of the parties as to the payment of the bonds. And the same considerations apply to the other transaction occurring at the same time, to wit, the loaning by plaintiff, as executor, the sum of $35,000 to Mr. Childs, or to said railway company, under a contract made between said Childs and plaintiff, which appears to me to be still more remotely connected with the question in hand than the transaction last referred to. The security and consideration for that loan to Mr. Childs or the railway company was a note of the railway company for the amount, indorsed by Mr. Childs, besides $114,000 first mortgage bonds of the company which were turned over to the plaintiff as collateral to the note, and nothing appears to show but that the parties at the time regarded the security as ample for the loan made. Both of the aforesaid transactions, while completed on the same occasion that the Boulevard Land Company conveyed title as aforesaid to plaintiff, were between other or different parties by separate written agreements, and each stood upon its own consideration, which was wholly independent of that between the plaintiff

and the land company, and do not, and were not intended to, as it seems to me, furnish consideration for it. Again, it was essential that the $2,000 of bonds held by Mrs. Clark should be brought in and canceled in order to protect the plaintiff's title, and also to have the mortgage satisfied. This being done, if plaintiff's bonds were paid by the transfer aforesaid, all the obligations which the mortgage was given to secure would be discharged, and the mortgage itself, as a consequence, also discharged.

"It seems that one of the defendants,—Mr. Tanner,—who had purchased some of the land covered by the mortgage, was made a defendant in the foreclosure proceedings then pending, and the sale of his property was threatened in that action. He was willing, it appears, to buy up those bonds and have them canceled, if plaintiff's matters with the Boulevard Land Company were to be settled, in order to relieve his property from the mortgage. From his evidence it appears that on the morning of the day of the transfer he had an interview with plaintiff's attorney in that action, who had conducted the negotiations for the adjustment in behalf of the plaintiff, and expressed his willingness to pay and discharge those bonds if the suit could or was to be settled, and was advised by the attorney to go ahead, and buy them; that it would be all right; the suit would be settled and discontinued. It is established that immediately thereafter Tanner purchased the bonds at an expense of about $500, and the same were turned over to the plaintiff, canceled, when he took the deed. We cannot see that Mr. Tanner's evidence is seriously contradicted. Plaintiff's attorney in that action admits that Tanner advised with him in reference to getting the bonds, but does not think he advised him in the form and language stated by Tanner. However that may be, we are satisfied that Mr. Tanner understood from that interview that the suit would be settled, and his premises relieved by the satisfaction of the mortgage, if he purchased and had canceled the Clark bonds; and, acting on that understanding, he in good faith purchased them at his own expense as aforesaid, and the same were turned over to plaintiff with the deed, and canceled. Unless plaintiff's bonds were to be paid, and the mortgage discharged, Tanner was expending and wasting about $500 to no purpose whatever, as is illustrated in this action (Tanner being a party defendant), his property being in the same manner again threatened if the mortgage still lives and the plaintiff's bonds are not paid. And I cannot believe that plaintiff's then attorney would have advised or permitted Mr. Tanner to expend and squander his money for the bonds unless he also understood, at the time of the interview, which was on the very eve of closing the transaction of April 24, 1896, that plaintiff's matters with the land company were to be settled, his bonds paid, and the mortgage satisfied.

"We shall mention but one other consideration. On June 17, 1898, in a letter written to Mr. Tidman, the plaintiff stated, 'The price I paid for the land was ridiculously high.' The land referred to is concededly the same covered by the mortgage in suit, and, in the absence of any explanation or suggestion to the contrary from the plaintiff, I am compelled to conclude that the expression quoted relates to the transaction of April 24, 1896, when plaintiff acquired his title as aforesaid; and that the price spoken of, which he had paid, was the satisfaction, or, in effect, the cancellation, of his $15,000 of bonds, and which constituted the consideration for his deed from the land company. If that was not what plaintiff meant, it is difficult, under the circumstances and evidence in this case, to give a satisfactory construction of his language used, as it is not claimed that any other consideration was paid to the Boulevard Land Company, the grantor, therefor, when title passed to the plaintiff.

"We have mentioned only some of the more prominent considerations which have impelled us to the conclusion which we have reached. There are other important and serious questions arising from the evidence, which, with the view we take, need not be here considered or passed upon. And as the defendant Boulevard Land Company, in its answer, asks judgment that the mortgage in suit be declared to have been paid, and that it be satisfied of record, our conclusion is that plaintiff's complaint should be dismissed upon the merits, with one bill of costs to the defendants represented by Mr. Burt, with one bill of costs to the defendants represented by Mr. Hamilton, and with one bill of costs to the defendants represented by Mr. Powell, and the said mort-

gage should be decreed satisfied, and the same discharged of record; and judgment is hereby ordered accordingly."

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and LAUGHLIN, JJ.

C. F. Birdseye, for appellant.

George N. Burt, F. E. Hamilton, and E. B. Powell, for respondents.

PER CURIAM. Judgment affirmed upon opinion of GOODELLE, Referee, with costs to each respondent appearing upon this appeal by separate attorney.

(57 App. Div. 351.)

HUN et al. v. BOURDON.

(Supreme Court, Appellate Division, Third Department. January 9, 1901.)

1. SALE OF LAND—SPECIFIC PERFORMANCE—DEED—EXECUTION — DUE DILIGENCE—TIME—ESSENCE OF CONTRACT.

Plaintiff, on November 13th, sold defendant a lot, and agreed in writing to deliver a deed December 1st. Defendant's attorney finished examining the abstract November 28th, and approved the title, and on November 29th plaintiff's attorney prepared a deed, and mailed it to one of the grantors in New Jersey, but the grantor's absence from home necessitated forwarding it to New York, and it was finally executed and returned December 5th, and sent to Albany, to another grantor, who was absent in New York, and the deed was forwarded by special messenger, executed, and returned the same day, and offered to defendant on December 6th. Defendant moved into the property November 15th, and made no objection to the delay in executing the deed until December 4th, when he tendered payment and demanded a deed, and on the next day moved out of the property without objecting to the title. Held, that plaintiff was entitled to specific performance of the contract, since time was not the essence of the contract, and plaintiff had exercised due diligence in securing the execution of the deed.

2. SAME—OBJECTION TO TITLE—WAIVER.

Where the title to a lot purchased by defendant had been accepted by his attorney without any objection to the assignment to defendant of certain tax certificates against the property, and defendant refused to accept the deed solely because not executed in time, the objection that the tax certificates should have been canceled cannot be raised in an action by plaintiff for specific performance.

3. SAME—ORAL EVIDENCE—ADMISSION—HARMLESS ERROR.

Where defendant refused to accept a deed to property because not executed within the time specified in the contract, and plaintiff brought an action for specific performance, error in admitting testimony of plaintiff's attorney as to a verbal understanding that defendant's attorney should have a reasonable time to examine the abstract, and that time should not be considered of importance, was harmless where defendant's attorney finished the examination of the abstract within the designated time.

Appeal from special term, Albany county.

Action by Marcus T. Hun and another, as trustees under the will of Joshua Howard King, deceased, and Dudley P. Olcott and another, against William Bourdon. From a judgment in favor of plaintiffs, defendant appeals. Affirmed.

On November 13, 1899, a contract was executed by J. Howard King and the plaintiffs Dudley P. Olcott and Frederick P. Olcott individually and as executors of John J. Olcott, deceased, of the first part, and by the defendant, of the second part, whereby the parties of the first part agreed to convey to the defendant, free from liens and incumbrances, a piece of land situate in the city of Albany; for which the defendant agreed to pay $100 on the execution